# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**DR. SHIV KUMAR, Ph.D.,**

      **Plaintiff,**

-v-

**ALDRICH CHEMICAL CO., INC.,**

      **Defendant.**

**Case No. 3:11-cv-144**

**Judge Thomas M. Rose**

---

### ENTRY AND ORDER GRANTING ALDRICH'S MOTION FOR SUMMARY JUDGMENT (Doc. #20); OVERRULING KUMAR'S MOTION TO STRIKE (Doc. #41) AS MOOT AND TERMINATING THIS CASE

---

Plaintiff Dr. Shiv Kumar, Ph.D. ("Kumar") claims that his former employer, Defendant Aldrich Chemical Co., Inc. ("Aldrich"), discriminated against him. Count I of Kumar's Complaint alleges that Aldrich discriminated against him due to his age in violation of the Age Discrimination In Employment Act ("ADEA"). Count II alleges age discrimination in violation of Ohio Rev. Code Chapter 4112. Count III alleges that Aldrich discriminated against Kumar because of Kumar's national origin in violation of Title VII of the Civil Rights Act of 1964 as amended. Count IV alleges national origin discrimination in violation of Ohio Rev. Code Chapter 4112. Count V alleges that Aldrich discriminated against Kumar because of Kumar's race in violation of Title VII, and Count VI alleges race discrimination in violation of Ohio Rev. Code Chapter 4112.

Now before the Court is Aldrich's Motion for Summary Judgment. (Doc. #20.) This Motion is now fully briefed and ripe for decision. A relevant factual background will first be set forth followed by the relevant legal provisions and an analysis of Aldrich's Motion.

# RELEVANT FACTUAL BACKGROUND

## The Parties - Kumar

Kumar was born on January 13, 1951, and is a dark-skinned Asian of Indian descent. (Compl. ¶ 8.) He is a naturalized U.S. citizen that was hired at Isotec's Miamisburg facility in August of 1994. (Deposition of Shiv Kumar ("Kumar Dep.") 11 Jan. 19, 2012; Affidavit of Shiv Kumar ("Kumar Aff." ¶ 5 Sept. 27, 2012.)

Prior to being purchased by Aldrich, Isotec recruited Kumar to create and synthesize labeled drug standards for use in drug testing labs. (Kumar Aff. ¶ 5.) Kumar became an "at will" employee of Aldrich. (Kumar Dep. 293.) Aldrich terminated Kumar's employment on January 13, 2010. (Kumar Dep. 11.)

At all times relevant, Kumar was a Principal Scientist in the Research and Development Department of Isotec. (Compl. ¶ 10.) As a Principal Scientist, Kumar was in a leadership and supervisory role and was responsible for a broad range of duties, including supervising chemists, proposing and developing new products, developing process improvement techniques, employing new and innovative technologies for new and existing products, overseeing product development, ensuring the safe operation of the laboratory for which he was responsible and providing scientific and technical direction to Aldrich's management. (Kumar Dep. 55-58; Deposition of Chou Tok Tan ("Tan Dep.") 20, 23-25, Ex. 4 June 6, 2012.) In addition to supervising the Good Manufacturing Process ("GMP") lab, Kumar carried out his own research projects, was an ISO representative for the Research and Development Department and was a member of the incident/accident investigation committee. (Kumar Aff. ¶ 1.) Kumar also participated in the marketing of the various compounds he synthesized. (Kumar Dep. 59-61.) At

the same time, according to Kumar, he published more scholarship than anyone in Isotec history. (Id. at 72.)

**The Parties - Aldrich**

Aldrich manufactures biochemical and organic chemical products for use in scientific research, biotechnology, pharmaceutical development, and chemical manufacturing. (Affidavit of Diane J. Szydel ("Szydel Aff.") ¶ 2 Aug. 30, 2012.) In February of 2001, Aldrich acquired a company called Isotec. (Id. ¶ 3.) Thus, Aldrich now owns the Isotec facility in Miamisburg, Ohio. (Id. ¶ 2.) Aldrich's Miamisburg facility, Isotec, purifies and stabilizes isotopes and incorporates the isotopes into molecules via organic synthesis. (Deposition of Joseph P. Porwoll ("Porwoll Dep.") 14 Mar. 6, 2012.)

Joe Porwoll is currently the Vice-President, Global Supply Chain for Sigma-Aldrich and was previously the President of Aldrich. (Porwoll Dep. 9.) He was Diane Szydel's ("Szydel's") supervisor at all times relevant. (Id. at 13.) Doug Rau is and was at all times relevant the Vice President of Human Resources for Sigma-Aldrich. (Deposition of Douglas Rau ("Rau Dep.") 9-10 Mar. 6, 2012.) Finally, Jessica Janszewski is and was at all times relevant the Human Resources Manager for Sigma-Aldrich. (Deposition of Jessica Janszewski ("Janszewski Dep.") 12-13 Mar. 7, 2012.)

Diane Szydel ("Szydel") is the General Manager of the Isotec facility located in Miamisburg beginning in 2002. (Id. ¶ 1, 3.) Dr. Chou Tok Tan ("Tan") is the Manager of the Research and Development Department at the Miamisburg Isotec facility. (Tan Dep. 9.) Tan is of Malaysian descent and is 64 years old. (Affidavit of Chou Tok Tan, Ph.D. ("Tan Aff.") ¶ 2 Aug. 30, 2012.) During all times relevant, Tan was Kumar's direct supervisor. (Kumar Dep. 44, 121;

Tan Dep. 11.)

## Aldrich's Performance Evaulation System

In the first quarter of each year, an Aldrich employee and manager set the employee's annual goals which stay the same throughout the year. (Tan Dep. 79.) The employee and manager then have a mid-year review so the employee has some notice and a chance to improve if there are performance concerns. (Id. at 74.) Ultimately the supervisor decides what the overall employee's performance was and assigns a rating. (Rau Dep. 69.)

Aldrich provides "targeted distribution" guidelines for annual performance ratings. (Tan Dep. Ex. 3; Pl. Ex. 1.) The guidelines suggest the percent of employees that should be given each of the overall performance ratings that are available. (Id.)

Aldrich requires those giving the annual performance ratings to "calibrate" their ratings across the organization by working with higher level managers and the Human Resources Department. (Tan Dep. Ex. 3.) The "cross-calibration," according to Aldrich, is "essential to fairness and equally high standards throughout the organization." (Id.)

Prior to 2008, Aldrich had 3 possible overall ratings: superior, strong, and needs improvement. (Tan Aff. Ex. A.) In 2008, Aldrich changed its overall ratings from 3 to 5 possible ratings: consistently and significantly exceeds all expectations, consistently meets all and exceeds some expectation, consistently meets expectations, meets some but not all expectations and does not meet expectations. (Pl. Ex. 1.) The overall ratings available for 2009 were the same as those available for 2008. (Pl. Ex. 1, Tan Dep. Ex. 3.)

## Kumar's Performance as Principal Scientist

### Performance Prior to 2005

For appraisal year 2002, Tan told Kumar that he needed to improve (1) on-time delivery, (2) the number of products completed and (3) the cost effectiveness of his group. (Tan Aff. ¶ 5.) For appraisal year 2003, Tan again counseled Kumar about late orders and told Kumar that he needed to put more effort in his Plan-To-Do-Study-Act ("PDSA"). (Id. ¶ 6.) For appraisal year 2004, Tan counseled Kumar that he needed to improve his overall work performance, particularly in areas where he was seriously deficient. (Id. ¶ 7.) Deficient areas were supervisory responsibilities, on-time delivery, Master Production Records ("MPRs") and PDSA. (Id.)

In 2002 and 2004, Kumar received an overall rating of "strong." (Id. Ex. A, C.) Kumar's overall rating for 2003 was not provided to the Court.

On October 15, 2004, Kumar was issued a written warning for inattentiveness to safety policies from Tan and Szydel. (Id. ¶ 8, Ex. D.) The incident that precipitated this written warning was a serious breach of Aldrich's chemical handling policies. (Id. ¶ 8.)

**2005 Performance**

For appraisal year 2005, Kumar received an overall rating of "Needs Improvement." (Kumar Dep. 144-45, Ex. 7.) Tan indicates that Kumar needs improvement in 11 separate categories: development of new products; preparation of MPRs; supervisory responsibilities; late order and on-time delivery; treating others with respect and dignity; creating a positive work environment; applying the Aldrich model for improvement including PDSA and the One Page Report; embracing and leading change; instilling a sense of urgency in others; translating vision into employee action plans; and managing a cost effective workgroup. (Kumar Dep. Ex. 7.)

Kumar and Tan discussed the areas needing improvement. (Kumar Dep. 147-67.) When discussing certain areas, Tan told Kumar, according to Kumar, not to worry because everybody

needed some sort of improvement. (Kumar Dep. 167.) According the Kumar, on one issue, judgments and criticisms, Tan did not respond to Kumar's questions. (Id.) When specifically asked about the "needs improvement" areas, Kumar either provided his reasons for the deficiency or placed the responsibility on others. (Kumar Dep. 153, 156, 159-61.)

Under the category "Creates a positive work environment," Tan indicates that Kumar violated the internet guidelines, created a bad influence to others and used many hours of company time to "surf" the internet unrelated to work. (Id. at Ex.7.) Kumar testified that he "may have" used the internet "for other than work purposes." (Id. at 148.)

Because of his overall rating of "Needs Improvement," Kumar was placed on Special Review. (Kumar Dep. 186-87, Ex. 8.) The Special Review required a 90-day developmental plan geared to improving overall performance. (Kumar Dep. Ex. 8.) A developmental plan was identified. (Id.) Kumar agreed to the Special Review and was taken off of Special Review after 30 days. (Kumar Dep. 188, Ex. 8.)

**2006 - 2007 Performance**

For appraisal years 2006 and 2007, Kumar received overall ratings of "Strong." (Kumar Dep. Ex. 9, 10.) For 2006, Tan indicated that Kumar "Needs Improvement" in maintaining on-time delivery, in acting as an ISO REP, and in his productivity for making new products. (Kumar Dep. Ex. 9.) Kumar was rated "Superior" in Safety Attendance, Safety, and in insuring that employees are provided a proper level of Environment, Health & Safety ("EH&S") and quality systems training. (Id.)

In the 2006 appraisal, Tan acknowledged that Kumar put in extra hours for late delivery. (Kumar Dep. Ex. 9.) He also acknowledged that Kumar finds new customers for Urea 13c,

assists sales and marketing in promoting the breath test business and works closely with marketing to promote two new products. (Id.)

For 2007, Tan indicates that Kumar "Needs Improvement" in process improvement. (Kumar Dep. Ex. 10.) Kumar was rated "Superior" in evaluating EH&S and quality risks before making changes and in supporting every department "like their own." (Id.)

## 2008 Performance

In 2008, Aldrich changed its overall ratings from 3 to 5 possible ratings. Kumar received an overall rating of "meets some." (Kumar Dep. Ex. 11.) Kumar agrees that this overall rating was below the acceptable standard. (Id. at 241-42.)

When Kumar asked Tan why he was receiving a "meets some" rating in the revenue category, Tan told Kumar that Kumar was not meeting his revenue goals. (Kumar Dep. 218.) When Kumar assured Tan that he would meet the revenue goal by the end of the fourth quarter, Tan responded "that's fine," but did not change the rating. (Id.) Finally, Kumar was not placed on a performance improvement plan or terminated as a result of this overall rating. (Tan Dep. 126.)

Kumar's 2008 performance appraisal indicates that he was behind in his goal to manage controllable expenses and his goal to improve product fill rate for US/EU. (Kumar Dep. Ex. 11.) This performance appraisal also indicates that Kumar's goal of improving SAFC service is at risk. (Id.)

In February of 2008, Szydel informed Kumar that his on-time performance was at 25%. (Kumar Dep. 231-32, Ex. 13.) Kumar did not dispute the report, but, instead says the compounds were in stock and the inventory was incorrect due to the actions of others. (Id. at 231-33.)

In May of 2008, Szydel informed Kumar that his group was the only group that had not made any improvement in their critical inventory level. (Kumar Dep. 222-23, Ex. 12.) She further said that Kumar needed to demonstrate an immediate improvement in his critical inventory level for the key products listed under his responsibility. (Id.)  Kumar testified that he was "pretty sure" that this problem was resolved by making the compound before running out of inventory. (Id. at 224-25.)

In February of 2008, Brett Eshbaugh ("Eshbaugh"), Production Manufacturing Supervisor with overall safety responsibility for Isotec's Miamisburg plant, asked Kumar to hold a training session on hazardous chemicals. (Kumar Dep. 243-48, Ex. 14.) Kumar did not hold the requested training session until after numerous follow-up requests by Eshbaugh in March, October and December of 2008. (Id.) Kumar says he did not do the training sessions when requested because the training was Eshbaugh's responsibility and because  Eshbaugh had to put the plan to conduct training together first. (Id. at 244-49.)

In 2008, when Kumar was supervisor over the GMP lab, there was a problem that occurred with a process in the lab. (Kumar Dep. 252-53.) After an investigation, a special Closure Committee[1] determined that Kumar and his subordinates needed to take additional training on handling gases. (Deposition of Diane Szydel ("Szydel Dep.") 60 Jun. 26, 2012; Deposition of Brett Eshbaugh ("Eshbaugh Dep.") 39-40 Apr. 12, 2012.)

Kumar testified that, because the incident occurred in his lab while he was supervisor, it was important for him to attend the training session and it was his intention to attend. (Kumar

---

[1]Closure Committees are constituted by facility management to investigate and make recommendations for responding to unsafe conditions. (Szydel Aff. ¶ 8.)

Dep. 253.) However, Kumar and his subordinates did not attend the training when it was specifically scheduled. (Kumar Dep. 250-51, Ex. 15.)

Eshbaugh told Kumar that he, as a supervisor, needed to improve his understanding and processing of Urea to a Level 3 training[2] to be able to assist his direct reports in handling and resolving any issues that may arise. (Kumar Dep. 254-56, Ex. 16.) Eshbaugh reminded Kumar that Kumar needed to complete the training as soon as possible. (Id. Ex. 16.) Kumar testified that he already knew "exactly step by step how this compound is synthesized." (Kumar Dep. 255.) As of the date of his discharge, Kumar had not completed this training to a Level 3. (Szydel Aff. ¶ 8.)

### 2009 Performance

In 2009, Kumar again received an overall rating of "consistently meets most, but not all performance expectations." (Tan Dep. 52, Kumar Dep. Ex. 17.) This was the equivalent of the "meets some" overall rating given in 2008 and placed Kumar in the bottom 10% of employees for both years. (Tan Aff. ¶ 4.)

Tan indicated that Kumar needed to "work hard" to make more products to improve sales, that Kumar was still not preparing the PDSA properly, and that Kumar still needed to complete the cross training required for GMP production of Urea. (Kumar Dep. Ex. 17.) Kumar offered a reason for each of the unacceptable ratings that places the responsibility for them somewhere else and not on him. (Id.)

---

[2]Aldrich uses a four-stage training process that requires individuals at different levels of responsibility to achieve sufficient levels of training. (Szydel Aff. ¶ 8.) The levels range from Level 1 which is a general awareness to Level 4 where the individual is capable of running or handling a reaction on their own. (Id.)

Tan testified that Kumar had not put the process improvements that he was working on into the proper Aldrich format. (Tan Dep. 94.) Tan also testified that he thought Kumar was not training his subordinates effectively. (Id. at 99.) Finally, Tan testified that Kumar was not proactive enough. (Id. at 110.)

Kumar missed three months of work in 2009 due to an FMLA leave. (Kumar Dep. 143.) Tan did not prorate any of Kumar's 2009 performance goals to account for this absence. (Id. at Ex. 7.)

Tan never shared Kumar's 2009 year-end performance appraisal with Kumar. (Kumar Dep. 261.) Also, Tan and Szydel prepared a draft of a performance improvement plan for Kumar following the 2009 appraisal, but it was never implemented. (Tan Dep. 116-19.)

During 2009, Kumar had some attendance issues. In June of 2009, Kumar took time off for a dental appointment. (Id. at 276-78.) Although he told Tan that he would return after the appointment, he did not return and did not notify Tan or anyone else at Aldrich that he would not return. (Id. at 277-79, Ex. 21.) Kumar had emailed Tan that he had the dental appointment and would try to come in if he could or would otherwise take off that day. (Id.) That same month, Kumar was scheduled to return from vacation on June 25 but did not return that day nor did he notify anyone at Aldrich that he would not return that day. (Id.) Finally, in July of 2009, Kumar had jury duty, was released from jury duty at 10:45 a.m. and did not return to work per Aldrich's policy. (Id. At 286-87, Ex. 22.) He also did not notify anyone that he would not be returning to work. (Id.) After Human Resources followed up with him, Kumar elected to use vacation time for the remaining half day. (Id.)

Kumar also had some communications issues during 2009. In September of 2009, Kumar

contacted a customer directly regarding a product. (Kumar Dep. 266-69, Ex. 18.) Szydel advised

Kumar that, before contacting a customer directly, he should see if there is already a relationship

between Aldrich and the customer. (Id.) Szydel indicated that she expected communication with

others internally. (Id.) Kumar testified the he thought he needed to contact the customer directly

regarding technical issues. (Id. at 267-68.)

**Kumar's Termination**

Due to the global financial crisis at the end of 2008, Aldrich took some measures at the

beginning of 2009 including a wage freeze and cost control measures. (Rau Dep. 15.) Later in

2009, Aldrich determined that it needed to reduce its labor costs. (Id.) They used attrition and

considered vacant positions to reduce their labor costs. (Id. at 15-16.) Also in 2009, Aldrich

offered a voluntary retirement to employees. (Id. at 16-17.)

In late 2009, Aldrich was considering a reduction in its workforce ("RIF"). (Szydel Dep.

15; Rau Dep. 14-15.) Aldrich considered employees who were not performing at an expectation

level, that occupied redundant or excess capacity or positions that could be consolidated. (Id. at

19.)

Late in 2009, Szydel was asked to rank her employees without telling her why. (Szydel

Dep. 21.) Laura Reed ("Reed") was the individual at the bottom of Szydel's list. (Id. 15.)

In a conversation with Joe Porwoll ("Porwoll"), her superior, in January of 2010, Szydel

inquired as to whether a performance-based termination could be made instead of terminating a

different person as a result of the RIF. (Szydel Dep. 15, 24-26.) Kumar's name came up because

he was the only individual at the time that had received a "Needs Improvement" rating two years

in a row. (Id.) Szydel recommended Kumar as a person for possible termination for poor

performance. (Id.) Porwoll said he would look into it and take the information back to corporate. (Id. at 27.)

On January 7, 2010, Aldrich drafted a "tentative" RIF list. (Porwoll Dep Ex. 4.) Kumar was not on this tentative list and Reed was. (Id.) Aldrich revised this list and, on January 9, 2010, the list included Kumar and did not include Reed. (Id.)

Aldrich's management and Human Resources personnel supported Szydel's recommendation to terminate Kumar due to poor performance. (Deposition of John Short ("Short Dep.") 83-84 Aug. 21, 2012; Szydel Dep. Ex. 2.) Kumar was then terminated on January 13, 2010, for performance related reasons. (Szydel Dep. 36-40.)

Kumar was informed of his termination in a meeting conducted by Szydel. (Szydel Dep. 36.) In addition to Szydel and Kumar, Tan was in attendance. (Id.) Jessica Janszewski ("Janszewski"), a corporate Human Resources representative, was also in attendance via telephone. (Id.)

Szydel testified that she started the meeting by informing Kumar that Janszewski was on the telephone. (Id. at 38.) She then informed Kumar that he was being terminated for performance related reasons. (Id.) She then handed Kumar a "Employment Separation Agreement and General Release" (the "Agreement"). (Id. at 41.)

The Agreement indicates that Kumar is providing Aldrich with notice of early retirement effective January 13, 2010, that Kumar will receive his salary and benefits through January 13, 2010, that Kumar is entitled to a severance payment of $34,357[3], that Aldrich will not contest an

---

[3]Although Rau does not recall what Kumar was offered, he testifies that the amount listed in the Agreement was half of what individuals selected for the RIF received. (Rau Dep. 27.)

application for unemployment benefits, that Kumar's group health and dental insurance will continue through January 31, 2010, and that Aldrich will provide out-placement services for three (3) months. (Tan Dep. Ex. 6.) In return, Kumar will release all claims against Aldrich, will not file a lawsuit against Aldrich or request arbitration and will keep the circumstances leading to and the contents of the Agreement confidential and will not make disparaging remarks about Aldrich or its employees. (Id.) The Agreement also contains other provisions not relevant here.

Szydel remembers that Kumar was extremely angry about his separation at the time . (Szydel Dep. 443.) Janszewski tried to talk to Kumar but he kept interrupting her. (Id. At 43.) The meeting ended by Janszewski asking Kumar to take the information with him, review it and get back in touch with her. (Id. at 43-44.) He never did. (Deposition of Jessica Janszewski ("Janszewski Dep.") 54-55 Mar. 7, 2012.)

Aldrich says that Kumar was terminated for poor performance. (Rau Dep. 31.) Aldrich also says it was trying to be respectful to Kumar and give him a respectful way to leave and tell his colleagues that he was retiring. (Id.)

**The Principal Scientist Position After Kumar's Departure**

The position of Principal Scientist that Kumar held was never filled following his departure and no direct replacement of Kumar was ever hired. (Szydel Aff. ¶ 9; Szydel Dep. 83-84; Tan Dep. 136.) Kumar's duties were spread among existing and new employees as Aldrich reorganized its departments and supervisors. (Szydel Dep. 83; Tan Dep. 136-40; Kumar Dep. 296-97.)

Kumar applied for a Principal Scientist position at Isotec in September of 2011. (Kumar Dep. 14-17, Ex. 1.) Kumar knew that Szydel, Tan and Eshbaugh still worked there and the plant

was still owned by Aldrich. (Kumar Dep. 14-17.) Finally, the job posting was for most of the same job functions as Kumar had when he worked there. (Kumar Dep. 17.) He never heard anything regarding this application. (Id.)

## RELEVANT LEGAL PROVISIONS

### Motion for Summary Judgment

The Court is reviewing herein a motion for summary judgment. The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for

trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of

material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, declarations, stipulations, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c)(1)(A).

<u>**Discrimination Claims**</u>

Kumar alleges that Aldrich discriminated against him on the basis of his age, his national origin and his race in violation of the ADEA, Title VII and Ohio Rev. Code Ch. 4112. Kumar also asserts that he has identified direct evidence of age discrimination in violation of the ADEA.

The ADEA prohibits an employer from failing to hire, discharging or discriminating against an individual with respect to her or his compensation or terms, conditions or privileges of employment because of her or his age. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009)(citing 29 U.S.C. § 623(a)(1)). A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence. *Id.* Direct evidence, in this case, is evidence which, if believed, would require the conclusion that unlawful discrimination was at least a motivating factor in Aldrich's decision to terminate Kumar's employment. However, the mere offer of early retirement is not, in and of itself, direct evidence of age discrimination. *Lasley v. Veterans Administration*, 789 F. Supp. 1468, 1475 (E.D. Mo. 1992)(citing First and Seventh Circuit and district court cases). If Kumar does not have direct evidence of age discrimination, his age discrimination claim is analyzed using the *McDonnell Douglas* burden shifting framework. *Geiger*, 579 F.3d at 622.

Kumar does not allege that he has direct evidence of national origin or race discrimination. Thus, these claims are analyzed using the *McDonnell Douglas* burden-shifting

framework. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *Ohio Civil Rights Commission v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 672 (Ohio 1994)(Ohio courts apply federal law to state discrimination claims).

### *McDonnell Douglas* Burden-Shifting Framework

The *McDonnell Douglas* burden-shifting framework provides an allocation of the burden of production and an order for the presentation of proof in disparate treatment cases. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)(citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)). The framework is designed to "sharpen the inquiry to a level of specificity which best allows the fact-finder to resolve the ultimate question: whether the plaintiff established by a preponderance of the evidence that the defendant intentionally discriminated against her." *Cline*, 206 F.3d at 660(citing *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

Under the *McDonnell Douglas* burden shifting framework, a plaintiff must first identify evidence that satisfies a prima facie case of discrimination. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)(citing *Newman v. Federal Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001)). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason or reasons for its actions. *Id.* If the employer does so, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. *Id.* The ultimate burden of persuasion remains at all times with the plaintiff. *Id.*

Prima Facie Case

A prima facie case of age, national origin or race discrimination is made by showing the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was subjected to an adverse employment decision; (3) the plaintiff was qualified for the position; and (4) the plaintiff was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Arendale*, 513 F.3d at 622-23; *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004); *Ercegovich*, 154 F.3d at 350.

To establish the third element of a prima facie case of discrimination, a plaintiff need only demonstrate that she or he was objectively qualified for the position. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). However, the employer's alleged nondiscriminatory reason for taking an adverse employment action may not be considered when determining if a plaintiff was qualified for the position. *Id.* at 574. The court should consider the plaintiff's education, experience in the relevant industry and demonstrated possession of the required general skills. *Id.* at 576. Finally, the plaintiff must show that she or he met her or his employer's legitimate expectations at the time of his termination. *Webb v. Servicemaster BSC LLC*, 438 F. App'x 451, 453 (6th Cir. 2011); *Warfield v. Lebanon Correctional Institution*, 181 F.3d 723, 729 (6th Cir. 1999).

One option for the fourth element of a prima facie case is to show that the plaintiff was treated differently than similarly-situated, non-protected employees. To be deemed similarly situated, the individuals with whom the plaintiff seeks to compare his treatment must have been the same in all relevant aspects. *Bobo v. United Parcel Service*, 665 F.3d 741, 751 (6th Cir. 2012). The court is to make a determination as to what are the relevant aspects. *Id.* In the case of age discrimination, the protected class is all workers at least 40 years of age and one branch of the

fourth element is modified to require replacement by a significantly younger person instead of someone outside the protected class. *Harmon v. Earthgrains Baking Companies, Inc.*, No. 08-5227, 2009 WL 332705 at *4 (6th Cir. Feb. 11, 2009).

Legitimate, Non-Discriminatory Reason

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment decision. *Arendale*, 519 F.3d at 603. One such reason is that an employer can legitimately terminate an at-will employee for poor performance. *Abdulnour v. Campbell Soup Supply Company, LLC*, 502 F.3d 496, 502 (6th Cir. 2007).

Pretext

If the employer meets this burden of production, the burden shifts back to the plaintiff to show that the legitimate nondiscriminatory reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Clay v. United Parcel Service*, 501 F.3d 695, 704 (6th Cir. 2007)(citing *Johnson v Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). A reason cannot be a pretext for discrimination unless it is shown that the reason is both false and that discrimination was the real reason. *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)(citing *St. Mary's Honor Center*, 509 U.S. 502). Finally, to show pretext, an employee may not rely upon her or his prima facie evidence, but must, instead, introduce additional evidence of discrimination. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009).

Consideration of pretext focuses on the defendant's beliefs and not on the plaintiff's own

perceptions. *Scott v. Thomas & King, Inc.*, No. 3:09-CV-147, 2010 WL 2630166 at *8 (S.D. Ohio June 28, 2010.) Self-serving statements by the plaintiff that he or she believes that he or she was discriminated against because of age are not enough. *Id.*

The reasonableness of an employer's decision may be considered to the extent that such a question sheds light on whether the employer's proffered reason for the employment decision was its actual motivation. *Wexler*, 317 F.3d at 576 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). If the employer demonstrates that its actions, while perhaps "mistaken, foolish, trivial, or baseless," were not taken with discriminatory intent, the employer arguably lacks the discriminatory intent which is the focus of a discrimination suit. *Clay*, 501 F.3d at 715(quoting *Smith*, 155 F.3d at 806). Finally, mere disagreement with an employer's evaluation of an employee regarding the employee's performance is not sufficient to create a genuine issue of material fact where the evaluator had an honest belief that the employee was not performing as expected. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725-26 (6th Cir. 2012).

"Inconsistency in an employer's explanation of the reasons for an adverse action 'raises an inference [of ]pretext] that must be drawn, at summary judgment, in favor of the nonmovant." *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 122 (6th Cir. 2007)(citing *Seay v. Tennessee Valley Authority*, 339 F.3d 454, 468 (6th Cir. 2003)). This is because a reasonable jury could infer that, if an employer cannot give a straight answer to a relevant question, the reasonable jury could conclude that the employer is trying to hide something. *Id.*

On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine issue of material fact at each stage of the *McDonnell Douglas* analysis. *Clay*, 501 F.3d at 703. However, "[c]onclusory assertions, supported only by Plaintiff's

own opinions, cannot withstand a motion for summary judgment." *Arendale*, 519 F.3d at 605.

## ANALYSIS

### Direct Evidence of Age Discrimination

Kumar's claim that he has identified direct evidence of age discrimination is first addressed. Kumar's direct evidence is that Aldrich forced him to take early retirement. However, there is no evidence in the record that Aldrich forced Kumar to take early retirement. The evidence shows that Aldrich offered Kumar the opportunity to take early retirement but he elected not to do so. Since he did not take early retirement, Kumar cannot now say that he was forced to take early retirement.

Kumar was given the Agreement that indicated that he is providing Aldrich with notice of early retirement. However, Kumar never agreed to this. Kumar testifies that nothing was said before he was given the Agreement and Szydel testifies that she told Kumar that he was being terminated for performance reasons before she gave him the Agreement. However, the timing of when Kumar was terminated compared to when he was given the Agreement is immaterial. It is immaterial because Kumar did not sign the Agreement. Thus, Kumar has not presented direct evidence of age discrimination so his age discrimination claim is analyzed using the *McDonnell Douglas* burden shifting framework.

### Prima Facie Case of Discrimination

Aldrich argues that Kumar cannot establish the third and fourth elements of a prima facie case of age, race, or national origin discrimination. Kumar argues that he can, so relevant evidence regarding the third and fourth elements will be examined.

### The Third Element: Was Kumar Qualified for the Position of Principal Scientist?

To establish the third element of a prima facie case of age, race or national origin discrimination, Kumar must identify evidence that he was objectively qualified for the position of Principal Scientist in the Research and Development Department of Isotec's Miamisburg facility. Further, Aldrich's alleged nondiscriminatory reason for terminating Kumar's employment may not be considered.

Kumar has presented evidence that he was a Ph.D. Chemist who was a Scientist/Principal Scientist at Isotec's Miamisburg facility for 15 years and had 25 years of experience developing and synthesizing chemical isotopes. Kumar has also presented evidence that he had the necessary training and qualifications to be a Principal Scientist at Isotec.

Aldrich argues that Kumar was not meeting expectations at the time of his discharge because he demonstrated a lack of effort, did not complete his work on time, failed to properly advance efficiency and effectiveness through the PDSA process, consistently ranked among the poorest performers at Aldrich in meeting production and sales targets, failed to complete his safety training responsibilities and had attendance issues. However, this evidence identified by Aldrich are allegations of poor performance and poor performance is Aldrich's nondiscriminatory reason for terminating Kumar's employment. Also, no mention is made of the third element in Aldrich's Reply Brief.

Kumar has identified evidence that he was qualified for Isotec's Principal Scientist position and Aldrich has not identified evidence that can be considered to show that Kumar was not meeting its expectations at the time Kumar's employment was terminated. Therefore, Kumar has presented evidence satisfying the third prong of his discrimination claims.

**The Fourth Element: Was Kumar Replaced By Someone Outside the Protected Class or Treated Differently than Similarly-Situated, Non-Protected Employees?**

To establish the fourth element of a prima facie case of age, race or national origin discrimination, Kumar must identify evidence that he was replaced by someone outside the protected class or evidence that he was treated differently than similarly-situated non-protected employees. Aldrich argues that Kumar cannot show either and Kumar argues that he has evidence of both.

### Replaced By Someone Outside the Protected Class

Kumar identifies no evidence that he was replaced by someone outside the protected class other than the evidence discussed below under the "treated differently" category. In fact, there is Rule 56 evidence that Kumar was not replaced at all. Thus, Kumar's arguments that he was "treated differently" will next be analyzed.

### Treated Differently

Kumar may also establish the fourth element by showing that a comparable, substantially younger non-Indian person was treated better than he. To satisfy this element, Kumar argues that he was terminated in a Reduction In Force ("RIF") and other similarly-situated employees that were substantially younger and non-Indian were not terminated in the RIF.

Kumar identifies nine current Aldrich employees who were not terminated as part of the RIF. Eight are substantially younger than he and eight are non-Indian. Kumar argues that only the 2008 and mid-year 2009 performance ratings are relevant to whether these nine employees were similarly situated, and all nine had performance ratings of less than "meets all" for 2008 and mid-year 2009. However, this argument is without merit because none of the nine were similarly situated in all relevant respects.

None of the nine employees identified by Kumar held the same job as he, worked at the

Isotec facility in Miamisburg or had the same supervisor as Kumar. If performance is to be considered, as Kumar argues, to be similarly situated, the individual giving the performance rating is relevant.

In this case, there is evidence that Tan determined Kumar's performance rating. Since Tan did not determine that performance ratings of the nine other individuals identified by Kumar, the nine other individuals are not similarly-situated to Kumar.

Kumar argues that the employees' supervisor is irrelevant to a similarly-situated determination because the only reasonable inference is that Corporate placed Kumar's name on the RIF list based upon his ratings for 2008 and mid-year 2009. However, this argument is not well founded for at least two reasons.

First, the lists upon which Kumar bases his inference were not RIF lists. (Short Dep. Ex. 2.) The alleged RIF lists upon which Kumar relies were actually created at the request of Aldrich's Human Resources Department as part of Aldrich's ongoing performance management process which was separate and apart from the RIF. (Id. at 30-32, 35-37.) These lists were created so that Aldrich site managers could determine what to do about the poor performers identified - either coaching to get them back to acceptable standards or exploring the option of exiting the employees from the company. (Id. at 46-47.)

Second, Kumar was terminated for his substandard performance over several years of time. (Szydel Aff. ¶¶ 6, 7.) The lists to which Kumar refers included only employees who had performance ratings of less than "meets all" for 2008 and mid-year 2009. Kumar has identified no evidence that these nine employees had a similarly long history of poor performance or that their supervisors or site managers recommended that their employment be terminated.

Kumar also argues that he can satisfy the showing that a comparable, substantially younger non-Indian person was treated better than he because Aldrich substituted him in the RIF for a substantially younger, non-Indian named Laura Reed ("Reed"). Kumar also argues that it is irrelevant that he and Reed had different supervisors because neither supervisor made the decision to replace Reed with Kumar on the RIF list.

This argument is not well-founded for at least two reasons. First, Reed was not similarly situated to Kumar. Reed was not a Principal Scientist like Kumar and Reed was never supervised by Tan. Reed was a Customer Service Manager who was directly supervised and performance-rated by Szydel. (Supplemental Affidavit of Diane Szydel ("Szydel Supp. Aff.") ¶¶ 3, 4 Oct. 17, 2012.) In addition, the Rule 56 evidence shows that Reed did not have a history of poor performance like Kumar did. (Id.) Finally, Reed was not on the list on which Kumar and nine (9) other employees were placed due to poor performance at the 2009 mid-year review. (Short Dep. Exs. 1 and 2.)

The second reason that this argument is not well-founded is that the list on which Reed's name appeared is a tentative RIF list. It is unknown based upon the discovery identified, who created the tentative RIF lists and for what purpose, if any, the lists were ever actually used. (Rau Dep. 14-15; Porwoll Dep. 52-53.) Thus the fact that Reed's name appeared on a tentative RIF list at one time but she was not ultimately terminated is immaterial.

### Conclusion Regarding Kumar's Prima Facie Evidence

The first two elements of a prima facie case of age, race or national origin discrimination are not disputed. There is Rule 56 evidence that Kumar satisfies both of these elements. Also, Kumar has identified evidence satisfying the third element - that he was qualified for the position

of Principal Scientist at Isotec's Miamisburg facility. However, Kumar has not identified evidence from which a reasonable juror could conclude that he satisfies the fourth element - that he was replace by someone outside the protected class or that he was treated differently than similarly-situated non-protected employees. Thus, Kumar has not identified evidence from which a reasonable juror could conclude that he satisfies all of the elements of a prima facie case of age, race or national origin discrimination. However, in the interest of justice, the remaining evidentiary burdens in *McDonnell Douglas* burden-shifting framework will be considered.

### Legitimate, Nondiscriminatory Reason

Next, Aldrich must articulate a legitimate, nondiscriminatory reason for terminating Kumar's employment. This it has done. As an at-will employee, Kumar was terminated, according to Aldrich, for poor performance over several years, most particularly in 2008 and 2009.

### Pretext

Kumar must next identify evidence that Aldrich's legitimate, nondiscriminatory reason for terminating his employment is a pretext for discrimination. He can do this by identifying evidence that Aldrich's legitimate nondiscriminatory reason (1) has no basis in fact, (2) did not actually motivate his termination, or (3) was insufficient to warrant termination.

Kumar argues that Aldrich's legitimate, nondiscriminatory reason has no basis in fact, that Aldrich's legitimate, nondiscriminatory reason did not actually motivate his termination and that Aldrich's shifting explanations for the legitimate, nondiscriminatory reason support a finding of pretext. Each of these arguments will be addressed seriatim.

### No Basis In Fact

Kumar argues that Aldrich's legitimate, nondiscriminatory reason has no basis in fact because his performance was not "poor." His overall performance ratings for 2006 and 2007 were "Strong." His 2008 performance rating was "Meets Some But Not All Expectations" and did not warrant a performance improvement plan. Finally, even when Kumar received the "Meets some But Not All Expectations" rating in 2009, Szydel and Tan planned to place him on a performance plan.

For purposes of establishing pretext, a plaintiff must show more than a dispute over the facts upon which the discharge is based. *Abdulnour*, 502 F.3d at 502. Also, so long as an employer honestly believed its proffered reason for termination, an employee cannot show pretext, even if the facts are later shown to be incorrect. *Segel v. Kimberly-Clark Corp.*, 473 F. App'x 416. 421 (6th Cir. 2012).

In this case, Kumar must show more than that he thinks his performance was not "poor." The performance appraisals are a matter of record, and there is no evidence that Aldrich did not honestly believe its reasons for Kumar's evaluations or for terminating Kumar's employment. This Court need not and will not second guess whether Kumar's performance appraisals, that are in the record, can be called "poor." Finally, a showing that Kumar's performance could not be termed "poor" is not a showing that Aldrich's legitimate, nondiscriminatory reason is a pretext for discrimination.

Kumar also argues that a comparison of the performance review Tan gave Kumar and his peers, C.W. and P.D., shows that Kumar's performance was not below expectations. Both, according to Kumar are substantially younger than Kumar, both are non-Indian, and both are scientists in R&D at Isotec. Kumar goes on to identify several alleged inconsistencies between the

2008 and 2009 performance evaluations of Kumar, C.W. and P.D. He then concludes that if his ratings were adjusted for what he actually achieved, he would have only one "Meets Most" rating, eight "Meets All" ratings and two "Exceeds Some" ratings and should have received the same overall rating as C.W. which was "Meets All."

There is evidence that Tan specifically looked at his employees' overall yearly performance when he determined what the overall performance rating would be. (Supplemental Affidavit of Chou Tok Tan ("Tan Supp. Aff.") ¶ 3 Oct. 16, 2012; Rau Dep. 67-69.) Further, Tan affirms that Kumar was the lowest performer of the three in 2008 and 2009. (Tan Supp. Aff. ¶ 3.)

The performance appraisals are a matter of record, and there is no evidence that Tan did not honestly believe his reasons for Kumar's evaluations. This Court need not and will not engage in a detailed comparison between Kumar's appraisals and C.W's and P.D.'s. While Kumar may not agree with Tan's overall ratings, they are, in fact, Tan's overall ratings and they do not appear to be unreasonable.

For 2008. Kumar skipped over some of the categories in his comparison, and he had significant issues where he pulled and shipped the wrong drug. For 2009 Kumar had a goal to complete 15 projects and had completed less than half that amount and less than what his personal goal would have been had it been prorated to reflect his extended absence that year. (Szydel Dep. 49.)

In sum, Kumar has not identified evidence that Aldrich's legitimate, nondiscriminatory reason for terminating him had no basis in fact. He has not identified evidence that his performance should not be termed "poor" by Aldrich and he has not identified evidence that a comparison of the performance review Tan gave Kumar and his peers, C.W. and P.D., shows that

Kumar's performance was not below expectations

## Did Not Actually Motivate

Kumar next argues that Aldrich's legitimate, nondiscriminatory reason for his termination did not actually motivate Aldrich because Aldrich did not terminate eight substantially younger, Caucasian, non-Indian employees who had the same performance ratings as he and because C.W. and P.D. received better performance ratings than he for substantially the same performance . Kumar also argues that Aldrich's reason did not motivate Aldrich because Aldrich did not terminate Reed whose performance was not better than his.

When attempting to prove pretext on the basis that a similarly situated employee was treated differently than other employees, just as in the prima facie case, the plaintiff must show that the other employees are similarly situated in all relevant aspects. *Segel*, 473 F. App'x at 423. As discussed above, Kumar has not shown that his performance was sufficiently similar to C.W.'s or P.D.'s. Indeed, C.W. and P.D. received higher ratings than Kumar for 2008 and 2009 and their overall performance from 2004/5 to 2009 was rated higher than Kumar's. Likewise, as determined above, the eight employees are not similarly situated to Kumar.

Finally, as determined above, Reed was not similarly situated to Kumar. Kumar argues that pretext exists because Szydel recommended him for a performance-based termination after learning that Reed might possibly be terminated as part of the RIF. However, this is not a reasonable inference of pretext because there is evidence that Szydel completed Reed's annual evaluation in November of 2009 and made no changes after that. (Szydel Supp. Aff. ¶ 4, Szydel Dep. 15.) Yet Reed's name did not appear on a RIF list until early 2010.

In sum, Kumar has not identified evidence from which a reasonable juror could conclude

that Aldrich's legitimate, nondiscriminatory reason for terminating his employment did not actually motivate Aldrich to terminate his employment. He has not identified evidence from which a reasonable juror could conclude that any of the individuals with which he attempts to draw a comparison were similarly situated to him.

### Shifting Explanations

Kumar's final argument regarding pretext is that Aldrich's shifting explanations for its decision to terminate his employment and its inability to identify who made that decision support a finding of pretext. Inconsistency in an employer's explanation of the reason for taking the adverse action raises an inference of pretext. *Coburn*, 238 F. App'x at 122.

Kumar first argues that Aldrich told Kumar that it was accepting his "request" for early retirement and never told him his discharge was for performance as part of the RIF. This argument fails for at least three (3) reasons. First, there is evidence that Szydel told Kumar that his employment was being terminated for poor performance but Kumar refused to listen. (Szydel Dep. 38-43, Ex. 2.) Second, Kumar never accepted the Separation Agreement which would have resulted in early retirement and allowed Kumar to save face with his colleagues. (Janszewski Dep. 49; Rau Dep. 30-31.) Third, there is evidence that Kumar was discharged for poor performance and not as part of the RIF. (Janszewski Dep. 37-39.)

Kumar next argues that Aldrich's witnesses could not agree on who made the termination decision and how it was made. He cites the depositions of various individuals who either claim not to have made the decision or had any direct role in the decision. However, there is evidence that Szydel recommended Kumar for termination and that recommendation was supported by the Human Resources Department.  (Short Dep. 83.)

Throughout this litigation, Aldrich has claimed that Kumar was terminated for poor performance and this reason has never shifted. Kumar disputes what was said at the meeting where he was terminated, but a dispute over what was said is not material to whether Kumar can show pretext by showing that Aldrich had shifting explanations for his termination. Finally, there is not evidence from which a reasonable juror could conclude that Aldrich provided shifting explanations for Kumar's termination or that the identification of precisely who made that decision is a shifting explanation showing pretext.

## Additional Evidence of Discrimination

To show pretext, Kumar must identify additional evidence of discrimination beyond the evidence relied upon to make a prima facie case. For this additional evidence, Kumar examines the RIF lists and concludes that Aldrich disproportionately targeted older and minority employees to be included in the RIF. Kumar, however, offers no statistical evidence or expert analysis regarding Aldrich's workforce as a whole or how the employees named on the tentative RIF lists reflects what actually happened. Finally, the creators of the RIF lists, the list's purposes and whether the lists were ever used have not been established by Kumar. (Rau Dep. 14-15; Porwoll Dep. 52-53.) Thus, no reasonable juror could conclude that Kumar has identified additional evidence of discrimination.

## CONCLUSION

Kumar has not identified evidence which a reasonable juror could conclude was direct evidence of age discrimination. In addition, Kumar has not identified evidence from which a reasonable juror could conclude that Kumar has satisfied the fourth element of a prima facie case of age, national origin or race discrimination - that he was replaced by someone outside the

protected class or that he was treated differently than a similarly-situated, non-protected employee.

Aldrich has shown a legitimate, nondiscriminatory reason for terminating Kumar's employment. If Kumar could present evidence satisfying all four elements of a prima facie case of age, national origin or race discrimination, he has not identified evidence from which a reasonable juror could conclude that Aldrich's reason is a pretext for discrimination.

Therefore, there are no genuine issues of material fact and Aldrich is entitled to judgment as a matter of law. Aldrich's Motion for Summary Judgment (doc. #20) is GRANTED.

Also pending in this matter is a Motion To Strike (doc. #41) filed by Kumar. Kumar seeks to strike paragraph 2 of the Supplemental Affidavit of Chou Tok Tan wherein Tan attests that Kumar was assigned fifteen (15) projects for 2009 and only completed seven (7) and that, even if Kumar's 2009 goal would have been prorated for the time he was off for FMLA leave, Kumar did not meet his goal.

There is other Rule 56 evidence that supports these conclusions and the Court need not consider and does not refer to paragraph 2 of Tan's Supplemental Affidavit. Therefore, Kumar's Motion To Strike is moot. Finally, the captioned cause is hereby order terminated on the docket records of the United States District Court for the Southern District of Ohio, Dayton Division.

**DONE** and **ORDERED** in Dayton, Ohio this Twenty-First day of November, 2012.

**s/Thomas M. Rose**
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record